## TORIVIO GONZALES v. THE STATE.

1. INDICTMENT — ELECTION. — When an indictment for murder charges in a single count that the mortal injuries were inflicted by different instruments or means, — as, by shooting, striking, and burning, — the prosecution cannot be forced to elect upon which of them a conviction will be sought.

2. SAME. — When several counts in the same indictment are substantially for the same offence, and are introduced for the purpose of meeting the evidence as it may transpire, the State will not be required to elect on which it will rely.

3. CHARGE OF THE COURT — REASONABLE DOUBT. — On the trial of an indictment for murder, which charged that the homicide was committed by shooting, striking, and burning, the court below instructed for acquittal in case the jury had a reasonable doubt whether or not the deceased came to his death by the hands of the defendant, from wounds inflicted by some of the means charged in the indictment. *Held*, correct, inasmuch as the jury were not bound to impute the death to any one of the alleged injuries, but could convict if satisfied by the evidence beyond a reasonable doubt that it was the result of all of them combined.

APPEAL from the District Court of Karnes. Tried below before the Hon. H. C. PLEASANTS.

The prosecution was for the murder of Felipe Melendes, in Karnes County, on December 10, 1876, and the conviction was for murder in the second degree, with fifteen years in the penitentiary assessed as punishment. The testimony, of which a synopsis is appended, discloses a case of unusual atrocity.

Frank Smith, colored, for the State, testified that on Sunday, the day upon which the injuries were inflicted, a little after noon, he started from the town of Helena to go to Mrs. Jacobs's place, on the Menehuila, and when he reached the summit of a hill, about fifteen and a-half miles distant, he saw two Mexicans about thirty steps ahead of him, on the side of the hill and a few feet to the right of the road. One was leaning against a horse, on the opposite side from witness, and the other was sitting on his horse, beyond the first one, waving a pistol over his head and talk-

ing in a loud voice, the only word which the witness caught being "cabron," which witness did not understand. Witness recognizes the appellant as the man who waved the pistol. Witness passed about one hundred and twenty-five yards beyond, and turned to look back, and just as he turned he saw the smoke from and heard the report of the pistol, and saw the man who was standing against the horse fall to the ground. He got up presently, when the appellant rode up to him and struck him over the head with the pistol, felling him again. Appellant then cantered away. Witness then went to a house about a half-mile distant and gave information of what he had seen, and in about one-half or three-quarters of an hour, with two other men, returned to the scene of these occurrences. Witness and party found the deceased about ten or fifteen feet from where he fell, lying on his all-fours, face downward, and in a wagon-rut. His clothes were all burned off from the waist up, except his wrist-bands and collar. Deceased was still alive. None of this party dismounted, or touched deceased, but started off immediately to get help. Witness went on to the place of his destination, some two miles distant, and did not return. Witness thinks the place of these occurrences lies in Karnes County.

T. C. Tumlinson, the second witness for the State, testified that the deceased was in his employ before his death, and died at his house, in Karnes County, on Sunday (about), November 19, 1876, seven days after he was wounded. On the Thursday before the injuries, deceased asked witness for money, stating that he was going to Cuero, to return on Saturday evening, and accordingly left witness's house. He did not return on Saturday evening, as per promise; and as he was a very prompt Mexican, witness expected him, of course, on Sunday. Late on Sunday evening a man came and told witness there was a Mexican out on the road, dying, who, he thought, was deceased. Witness took a

wagon and went to the place indicated, and found deceased lying on his face, or side, on the side of the road leading from Helena to Victoria. When witness got there deceased said, "Mr. Tumlinson, I am dying." Witness answered, "No, you may get well." The clothing was all burned off deceased from the waist up, except the wrist-bands of his shirt, and his body was burned into a crisp. The lower jaw was broken in several pieces, and witness noticed a hole under the jaw which appeared to have been made by a knife, a ·stick, or a bullet, — looked more like the work of a ball. Witness noticed no bruise on the head.

When witness arrived at the place where deceased was lying, it was some time in the night, and there were other parties with him, who had lighted a small fire. Witness attempted to light a small lamp he had with him, and struck four or five matches in the effort, but, on account of a strong wind blowing, could not do it. Witness then had deceased placed in the wagon and taken to his house, where he remained until he died, — seven days afterwards. At witness's request, another Mexican, named Gregorio, waited on deceased until the death of the latter. Witness made no delay in sending for a doctor, who, however, did not reach the wounded man until about daylight. The doctor did not set the jaw, as he said it was useless. When witness started in his wagon for deceased, he sent a messenger for Mr. John Ratliff, a neighbor, who speaks the Spanish language fluently, as he could not himself speak that language and the deceased could speak but little English. Saw the deceased frequently from that night until he died. Deceased often drank liquor, but witness had never seen him drunk. When deceased left the house of witness, going to Cuero, he wore, as was his custom, two shirts and a coat. He then had a pistol also. He did not have the pistol when witness reached him after he was wounded, though some one gave witness his belt and scabbard. Witness does not

think the pistol-wound in the jaw would have been fatal. Thinks he died from the effects of the burn.

John Ratliff was the next witness for the State. He testified that, on a Sunday night in 1876, T. C. Tumlinson sent for him to come and see deceased, whom he knew well, as he had once been in witness's employ. Saw him first in the wagon, as he was being taken to Tumlinson's house. His jaw was broken in three or four places. Witness could place his finger in deceased's mouth and poke it out at the hole running through under the chin. He had also a bad bruise on the head, just above the ear, which was some three inches long, and appeared to have been made by some heavy instrument. He was also burned into a crisp from his waist up to his neck, except two small places on his breast. Witness does not think the wounds by ball or blow would have produced death, but thinks deceased died from the burn. Deceased talked badly because of his broken jaw, which, however, witness set in two or three days, after a fashion, and in the best way he could; after which deceased talked better. Deceased talked a great deal to witness, and was perfectly conscious of approaching death. He told witness what disposition to make of his little property. Also told witness, of his own notion, voluntarily, and without questioning, who wounded him and how it came about. Deceased's narrative was substantially as follows:

Deceased " went to Cuero to attend to some business, and on his return met appellant in Yorktown, where they took several drinks together, and started to come by Gregorio's house. When the two got to the road leading from Helena to Victoria, deceased's horse fell with him, throwing his pistol from the scabbard to the ground. In the fall deceased's horse got loose. As deceased was catching him, appellant dismounted and picked up the pistol, remounted, and instantly commenced cursing and abusing deceased.

Deceased did not mount his horse, and presently appellant shot him in the mouth, felling him. As he got up, appellant, who had gone off a short distance, returned and struck deceased on the head with the pistol, felling him again. It seemed to deceased that appellant, after this, was gone a long time. When deceased again saw appellant he came and squatted by deceased, and, striking some matches, put fire to his (deceased's) shirt-bosom. Deceased was lying on his back, and could not move."

Witness knew that the Torivio Gonzales of whom deceased spoke was the appellant. Witness had the appellant in his employ at the same time he employed deceased. The two men, deceased and appellant, had once had some difficulty about some sheep, which witness did not then consider of a serious nature. Witness does not think that the deceased and appellant had met since the difficulty, until they met in Yorktown on this trip of the deceased's.

On the second or third day after the deceased was wounded, witness went to the place of the difficulty and examined it. Found the rut where deceased was found, and knew it by the ashes and blood. By the blood he traced some fifteen feet, to where he judged deceased first fell. Some four or five feet from where deceased fell, witness found four or five matches that had been struck. From the place where he appeared to have fallen to the place where he must have laid and burned was eastward, and still east of this place where he appeared to have laid and burned, witness saw where a little fire had been built. Between the place of his falling and the place of burning, witness also found, in addition to the blood, small patches of ashes. Witness also found a small pocket looking-glass and a pocket-knife, which he recognized as those which deceased was in the habit of carrying.

The next witness for the State was Gregorio, a Mexican, who testified that on the evening of the difficulty some men

came to his house and told him that deceased was in a dying
condition, and where he could be found.  Witness found
deceased lying near the Helena and Victoria Road, on his
all-fours.  Witness built a small fire near deceased, and
sent for Mr. Tumlinson.  When witness got to deceased he
found his belt, and his scabbard full of cartridges, but the
pistol was gone.  Gave the belt and scabbard to Mr. Tum-
linson.  Mr. Tumlinson took deceased to his house in his
wagon.  Witness waited on deceased until he died, — was
with him all the time until his death.  Deceased sometimes
appeared in his right mind and rational, but at others was
out of his right mind and irrational.  When he was sane
he would be talking about what he wanted done with his
property.  Just before he died he was out of his mind, and
seemed to fancy that he saw women flying through the air.
Witness did not hear him say who killed him, or how he was
killed.

No brief for the appellant.

*Thomas Ball,* Assistant Attorney-General, for the State.

WINKLER, J.  The appellant was convicted of murder in
the second degree, and his punishment assessed at fifteen
years' confinement in the State penitentiary ; and his motion
for a new trial having been overruled, he prosecutes this
appeal.

The sixth error assigned is, that the court erred in refus-
ing to compel the district attorney to elect as to which
count in the indictment he would try the defendant under, —
whether under the one charging the murder to have been
done by shooting, or the one charging it to have been done
by burning.

It is shown by bill of exceptions that the court was moved
to compel this election by the prosecuting attorney, when

the defendant was arraigned and before he entered his plea, and also after the evidence had been closed; which was refused by the court.

The indictment charges, with great, perhaps unnecessary particularity, first, that the accused shot the deceased in the mouth with a pistol, inflicting a mortal wound; secondly, that the accused struck the deceased on the head with a pistol, inflicting upon him a mortal bruise; and, thirdly, it charges that the accused set fire to and burned the clothes of the deceased, and thereby mortally burned him upon the back, breast, and side; and proceeds in this language: "Of which said mortal wounds, inflicted as aforesaid, in and upon the mouth of him, the said Melendes, and of which said mortal bruise, inflicted as aforesaid, in and upon the head of him, said Melendes, as well as of the said burning of the back, breast, and side of the body of him, the said Melendes, he, the said Melendes, then and there instantly died; and so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Torivio Gonzales, him, the said Felipe Melendes, in the manner and by the means aforesaid, wilfully and of his express malice aforethought, did kill and murder; against the peace and dignity of the State."

An inspection of the indictment shows beyond controversy that the pleader did not intend, nor did he in fact, as is unusual, charge that the murder was committed in three several ways, in so many different counts in the indictment, each having its proper separate commencement and conclusion; but that the several injuries were all inflicted by the accused upon the person of the deceased, and that by those several injuries the murder was consummated. This conclusion is inevitable from those portions of the indictment copied above.

The indictment does not aver that death was the result of either the shot; the blow upon the head, or the burning,

but that by these several means being employed the mur-
derous effect was produced.  If there had been more than
one proper count in the indictment, and the several counts
were "introduced solely for the purpose of meeting the
evidence as it might transpire, the charges being substan-
tially for the same offence," the prosecution would not be
required to elect.  *Dalton* v. *The State*, 4 Tex. Ct. App.
333, and authorities there cited.

The charge of the court on this branch of the subject is
complained of as allowing the jury too much latitude in
arriving at a verdict.  The fourth paragraph of the charge
is as follows : "If the jury have a reasonable doubt whether
or not the deceased came to his death by the hands of the
defendant, from wounds inflicted by some of the means
charged in the indictment, — that is, from the wounds in-
flicted by a pistol-shot, or by burning, — they must acquit."

Under this charge the jury would have been warranted
in finding the defendant guilty upon satisfactory evidence
that by the pistol-shot the deceased had been disabled to
free himself from his burning clothes, and in consequence
of his condition he died, although the jury might not have
been satisfied as to whether the shot or the burning was the
immediate cause of death, if the proof showed that beyond
doubt the death resulted from either, or from the effect of
the two combined.  We see no error in this charge, when
it is considered in the light of the evidence and the aver-
ments of the indictment, and in connection with the charge
of the court, taken as a whole.  On the contrary, we are of
opinion that the charge of the court fairly submitted to the
jury the question of the guilt or innocence of the accused,
and in a manner not likely to mislead.

The first charge asked by the accused and refused by the
court relates to the subject of murder in the first degree,
and need not be noticed here ; for, even if we should deem

the instruction proper to have been given at the trial, which is not perceived, it would not warrant the reversal of the judgment of conviction for murder in the second degree, the charge being in other respects unobjectionable.

It is urged in a motion in arrest of judgment that the indictment is insufficient in that it "presents no offence against the law," and because "the offence is not charged in plain and intelligible words." Counsel for the appellant fail, in the record or in arguments, to point out any defect in the indictment, and none are perceived.

It is urged in the fifth assignment of error that the verdict is contrary to law and the evidence. We have failed to discover that this assignment of error is sustained by the record. So far as the law of the case is concerned, the conviction is a proper one. As to the evidence, the only wonder is that the jury did not convict of murder in the first degree. The testimony not only shows the guilt of the accused, but shows also that a most unprovoked attack was made by the accused, when he must have known the deceased was unarmed and entirely helpless, and under these circumstances shot him down, and when he attempted to rise, struck him down by a blow upon the head, and, after going away from the bloody scene, returned, and, finding his victim prostrate and helpless, lit matches and fired his clothes, so that they were almost entirely consumed from the waist up, and his body burned until some of the witnesses thought that the burning was the cause of his death. The evidences of cruelty and fiendish barbarity are clear and unmistakable.

We have failed to discover any material error in the charge given, or in refusing those asked by the accused, or in overruling the motion for a new trial, or in refusing to arrest the judgment, or in refusing to require the counsel for the State to elect as to what particular portion of the

indictment he would try upon. The appellant has been fairly tried and legally convicted; and, judging by the case as presented, the punishment imposed is well merited.

The judgment of the District Court is affirmed.

*Affirmed.*